**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| BRUCE GOODWIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HIGH 5 ENTERTAINMENT, LLC,<br><br>Defendants. | Case No. 3:26-cv-132-TSL-RPM<br><br>**COMPLAINT -- CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bruce Goodwin, individually and on behalf of other members in the below-defined Class, hereby alleges against Defendant High 5 Entertainment, LLC a ("High 5," "High 5 Casino," or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based on the investigation made by the undersigned attorneys, as follows:

1. This Class Action lawsuit is brought by Plaintiff seeking damages, declaratory, injunctive, and equitable relief individually on behalf of the other Class members, each of whom are Mississippi residents who have paid and lost money or other things of value on High5casino.com (the "Class").

2. High 5 owns and operates a popular, internet-based casino website called www.Highcasino.com. High 5 is not registered or licensed to operate in Mississippi.

3. Yet High5casino.com is accessible and operational in Mississippi.

4. High 5 does not operate to promote or market another product or service; High5casino.com *is* the product or service.

5. High5casino.com operates indefinitely and not for a fixed period of time.

6. On its website, users can play "over 1700+ (sic.) games", including "slots," and live virtual table games such as roulette and blackjack (the "Chance Games").[1]

7. The Chance Games are games of chance that have been declared unlawful in Mississippi, including slot machines, poker, roulette, and other casino table games.

8. In fact, High 5 admits its games are chance-based by admitting its "primary games" use a random number generator.[2]

9. High 5 offers prizes, including cash-equivalent prizes, and admits on its website that it typically runs at a 96% return to player.[3] High 5 also admits that coins earned through gambling on its website "can be redeemed for real prizes."[4]

10. High 5 attempts to legitimize itself on a self-published legal opinion buried in a subpage of its website, https://high5casino.com/blog/legit/, by stating, "High 5 Casino emphasizes that no purchase is necessary, but players may opt to acquire extra virtual token bundles to extend or enhance their gameplay sessions."

11. High 5 accepts, and practically requires, a participant to pay to play to win a prize. Only "Sweeps Coins" can earn a prize.[5] High 5 markets, advertises, and encourages participants to purchase "Sweep Coins," and it makes a very limited number of "Sweep Coins" available for free, although conditionally and not at any locations in Mississippi.

12. For example, the very first thing Mississippi residents, including Plaintiff, see when accessing High5casino.com is the following advertisement:

---

[1] https://high5casino.com/

[2] https://high5casino.com/blog/legit/

[3] *Id.*

[4] *Id.*

[5] *Id.*




13. Mississippi residents must scroll the main website to find, in regular type font, the disclosure that High 5 can be played for free.

14. Even then, as further alleged below, free play doesn't offer the prizes that attract Mississippi residents, including Plaintiff, to High5casino.com. Instead, Mississippi residents, including Plaintiff, access High5caisno.com to win prizes, just as High 5 intends. And the only way to win prizes is with Sweep Coins.[6]

15. Nonetheless, the Mississippi Supreme Court has long held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme: "The award of credits … to play free additional games is likewise something of value, as a credit to play a free game necessarily has the same value as the amount it would cost to play that game." *Mississippi Gaming Comm'n v. Henson*, 800 So. 2d 110, 115 (Miss. 2001).

16. The legality of High 5 is not in question in states like Mississippi with strict gambling laws.

17. For example, the State of Connecticut issued a Summary Suspension Order to High 5 Casino's parent company High 5 Games. At the time, the Connecticut Department of Consumer

[6] https://high5casino.com/blog/legit/

Protection was investigating approximately 1,100 criminal counts of conducting illegal gaming activity in Connecticut and ordered High 5 Casino to immediately shut down the operation of high5casino.com in that state.

18. That same week, the Maryland Lottery and Gaming Control Agency notified Defendant High 5 that the agency had commenced an investigation into the website for operating an illegal gambling website in that state.

19. On February 7, 2025, a jury in a federal court in the Western District of Washington found the operators of high5casino.com liable for nearly $25 million. Six months earlier, the district court had already determined on summary judgment that high5casino.com was an illegal gambling website, and so the jury's only job was to decide civil damages. (*Larsen v. PTT, LLC* (W.D. Wash. 2024) 737 F. Supp.3d 1076.).[7]

20. On June 6, 2025, the New York State Attorney General shut down operation of Defendant's website in that state, explaining that the website is "unscrupulous," "unsecure," "illegal, dangerous, and can seriously ruin people's finances." At the same time, New York state Senator Addabbo Jr. warned that the website was targeting minors and creating "dangerous pathways for gambling addiction, especially among minors."

21. Since High 5 requires participants to submit consideration for a chance to win a prize, it is an illegal gambling operation in Mississippi.

22. Plaintiff and Class members each wagered money or other things of value on High5casino.us and lost in the last six years.

[7] Plaintiff reserves the right to amend the complaint later to name the two owners of High 5 to pierce the corporate veil if, like in the Washinton case, High 5 refuses to pay judgments.

23. Moreover, High 5 engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Mississippi, including causing Plaintiff and Class members to believe High 5 was approved and certified by the State of Mississippi, when in fact it is illegal gambling.

**A. The Parties**

24. Plaintiff Bruce Goodwin is domiciled in Wesson, Mississippi. Plaintiff wagered and lost money on Defendant's illegal gambling website. As a result, he suffered an injury in fact resulting in the loss of money and/or property that is recoverable in Mississippi. Plaintiff did not know High 5 was illegal gambling in Mississippi. Based on High 5's advertising and website, Plaintiff thought that High 5 was legal in Mississippi. Had he known the truth, he would not have participated in online gambling on High 5.

25. Defendant High 5 Casino is a Delaware limited liability company headquartered in Mahwah, New Jersey. Through its website, Defendant conducts business in Mississippi, including this District. High 5 is not registered to do business in Mississippi.

**B. Jurisdiction and Venue**

26. This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and one or more of the other Class members are citizens of a different state than Defendant.

27. Venue is proper in this District under 28 U.S.C. § 1391 because High 5 is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, Plaintiff wagered and lost money on High 5 in this District, and High 5 has marketed and advertised its website in this District, made its website accessible in this District, accepted wagers in this District,

and paid out prizes in this District, among other things. Thus, a substantial part of the events or omissions giving rise to the claim occurred within this District.

28. This Court has personal jurisdiction over Plaintiff because Plaintiff resides in Mississippi and consents to the jurisdiction of the Court.

29. This Court has personal jurisdiction over High 5 because High 5, at all times relevant hereto, has systematically and continually conducted, and continues to conduct, business in this State, and this lawsuit arises out of those contacts with Mississippi.

30. Specifically, High 5 is an interactive website used for commercial purposes – specifically, gambling.

31. It was foreseeable and intended that Mississippi residents would use the High 5 website because Defendant knew that Mississippi residents frequently gamble on the website and that they would continue to do so.

32. Defendant knows that Mississippi residents use the website because it asks users to disclose which state they live in when registering to use the website.

33. In fact, High 5 encouraged it by not listing Mississippi as an excluded territory.

34. High 5 also advertises to Mississippi residents in Mississippi, and emails Mississippi residents about games and other offers it seeks to promote.

35. In other words, High 5 reached into Mississippi and invited its customers to participate on its website.

36. High 5 appeals to, and profits from, an audience in Mississippi, and Mississippi residents form a significant portion of the website's customer base and revenue.

37. High 5 also collects information and data about Mississippi residents.

38. Defendant took steps to ensure that Mississippi residents would have access to the website so that they could gamble online. Specifically, there is widely available technology that allows websites to detect the location of a website visitor, including the state in which they are located. Reputable online gambling companies utilize this technology to prevent website users from using their websites if the website user is located in a state where online gambling is illegal, like Mississippi. However, Defendant made an affirmative decision to *not* use that technology for the High 5 website, because that would prevent Defendant from profiting from gambling in Mississippi

**C. The Problem Of Online Gambling**

39. The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.

40. For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than 1 percent, with 7 million Americans believed to be suffering from a gambling addiction at an annual "social cost" of $14 billion. But those numbers have skyrocketed with the advent of online gambling: from 2021 to 2022, there was a 45 percent increase in the number of calls, texts, and messages to the National Problem Gambling Helpline.

41. According to one study, up to 30 percent of problem gamblers have attempted suicide, while a larger percentage of such individuals reported having suicidal ideations.

42. The fallout is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers.

43. During the last five years, online gambling websites have proliferated with no way to reduce the ensuing harm. This shift is already evident with the gamblers seeking treatment, who tend to be younger, predominantly male, and raised on smart phones. This rise also includes a

relatively new phenomenon: gambling addiction among minors under the age of 18. Whereas brick-and-mortar casinos could take steps to exclude minors, the easy access to online gambling has made it easier for underage minors to participate in gambling. As described further below, High 5 Casino capitalized on this phenomenon and have designed high5casino.com to attract "Gen Z" individuals as young as 15 years old.

44. Treating online gambling addiction poses challenges that are different from other forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco and drug addiction programs, there are no federal funds allocated to support problem gambling services.

45. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like High5casino.com are unlicensed and unregulated. A gaming license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Defendant dodges all these requirements. As one gambling treatment provider warned, "[u]nregulated platforms [like High5casino.com] can pose significant risks for players struggling

with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

46. For example, High 5 accepts credit cards to pay for gambling on its website, in violation of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367. As a result, people, including Plaintiff, have racked up massive debt gambling on High5.

47. Defendant High 5 Casino also deprives state and local governments of tax revenues that legitimate, regulated casinos pay.

48. The bottom line is that High5casino.com lets people play online casino games and wager real money while skirting regulation and licensing, offering inadequate player protections, exploiting adolescents, and siphoning revenue from state governments.

49. In Mississippi, it is illegal to operate and offer online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. In this regard, Mississippi has a fundamental and deep-rooted public policy against gambling.

**D. High 5 Casino Operates A Gambling Website**

50. Defendant High 5 Casino operates a popular gambling website available at High5casino.com.

51. Defendant High 5 Casino states that the website is "your #1 destination for premier gameplay with the most robust slot content library in the world," and that players can play "hit games straight from the casino floor…."

52. When users log onto the website, the first thing they see is an array of colorful, digital slot machines and other Chance Games, along with information about the user's gambling balance near the top of the screen (denoted SC):




53. The website offers "live dealer" table games where online players interact directly with dealers visible via a webcam to play games like blackjack and roulette:



54. Just like one would see on the floor of a brick-and-mortar casino in Las Vegas, the digital slot machines come in a wide variety of styles and themes, such as the example shown below:




55. Even the name of the website—High5casino.com—evokes the obvious purpose of the website: gambling.

56. High 5 Casino's own Director of Legal Compliance, Courtney Lynch, includes a link on the signature portion of her emails stating, "Real Money Casino: High5casino.com."

57. Despite the clear purpose of the website, however, the word "gambling" is never used to describe what happens on the website. Instead, Defendant gaslights users—including adolescents or vulnerable populations struggling with gambling disorder—with euphemisms like "social gaming" and "sweepstakes." High 5 Casino falsely claims that the website is legal, when it is not.

58. It is common for individual users in Mississippi, including Plaintiff, to lose significant amounts of money gambling on the website.

59. The website also includes a webpage warning users to monitor for signs of what High 5 Casino euphemistically calls "a problem gaming issue," but which in fact describes all of the symptoms of gambling addiction.

60. High 5 is accessible and made available to Mississippi residents, and High 5 misrepresents and causes confusion about the legality of its website in Mississippi by not listing Mississippi as an excluded territory.

61. High 5 knows that Mississippi residents are gambling on its website, as users must create an account and verify their state before playing, and High 5 geo-fences some states, while not geo-fencing Mississippi, confirming that High 5 has the technology to know the states from which its participants are gambling.

### E. High 5 Casino Has Massively Scaled-Up An Old Gimmick That Criminals Once Tried To Use To Evade State Gambling Laws

#### 1. The Internet Café "Sweepstakes" Crime Trend Of The Early 2000s

62. The early 2000s saw a nationwide crime trend involving criminals who attempted to evade gambling laws by offering gambling at Internet cafés. These operations—often located in suburban strip malls—would "promote" the sale of a product such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased Internet time or whatever other product was offered, they received a corresponding number of "sweepstakes" points for each dollar spent. Customers could then use those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

63. Gambling in Mississippi consists of three elements: prize, chance, and consideration (i.e., payment). By artificially separating the consideration from the chance to win real money, criminal operators of Internet cafés believed that they could evade state gambling laws, while claiming that the activities were no different from the kinds of sweepstakes promotions occasionally offered by Publisher's Clearing House and McDonalds.

64. Courts and state law enforcement officials in the United States, including in Mississippi, repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling.

### 2. High 5 Casino Is An Online Version Of An Internet Café

65. Like the criminal Internet cafés in operation a decade ago, Defendants here attempt to separate the element of consideration from gambling; in this case by offering a two-tiered system of virtual coins, both of which function like casino chips.

66. The first type of virtual currency, called "Gold Coins," can be used to play the casino games in "standard mode" with no potential to win money. When using Gold Coins in "standard mode," a player can only win or lose Gold Coins. However, for the most part, people only go to High5casino.com to engage in real-money gambling, so those Gold Coins are largely ignored.

67. The second type of virtual currency –called "Sweeps Coins" or sometimes "Sweepstakes Coins"– can be used to play the same casino-style games in a "promotional sweepstakes mode," where they carry real monetary value and can be redeemed for prizes and money.

68. To get Sweeps Coins, website visitors typically must purchase them in a package with Gold Coins. The more Gold Coins a user purchases, the more Sweepstakes Coins the user

also receives. So, in effect, when a person buys Gold Coins, they are also buying Sweeps Coins as part of a package.

69. High 5 Casino pretends that the "Sweeps Coins" are a free "bonus" added to the sale of Gold Coins, but as shown above, that is exactly what the owners of Internet cafés unsuccessfully argued before. The reality is that generally, both coins must be purchased, and High 5 Casino will only sell them together as a package. There are two other problems with the notion that Sweeps Coins are just a "free" add-on bonus to the Gold Coins.

70. First, as noted above, most people ignore the Gold Coins after buying them.

71. Second, the number of Sweeps Coins is essentially a proxy for the amount of real money spent or won. That is because, depending on the package bought, there is a 1:1 or a nearly 1:1 correlation between the number of dollars spent and the number of Sweeps Coins provided in each purchase. So, for example, if someone spends $2 dollars ostensibly to by Gold Coins, they get 2 Sweeps Coins; whereas if they spend $5, they will get 5 Sweeps Coins, and so on. If someone purchases $1000 on virtual coins, they get 1005 Sweeps Coins.



72. Likewise, Sweeps Coins can be cashed-out for real-world money and are redeemable for cash on a 1:1 basis. So, for example, 100 Sweeps Coins can be redeemed for $100. This is how Internet cafés worked.

73. High 5 Casino touts the process of converting Sweeps Coins to cash is "quick and simple":

> ## Does High 5 Casino Award Real Cash Prizes?
>
> Yes, High 5 Casino awards real cash prizes! While the platform focuses on a fun and engaging social casino environment, it also allows players to redeem Sweeps Coins for real cash prizes.
>
> When you accumulate enough Sweeps Coins, you can convert them into real-world rewards, which is why our players can't get enough of our amazing games!
>
> The process is designed to be quick and simple.
>
> Once you hit the required amount of Sweeps Coins, you can redeem them for cash prizes through the redeem cashier or exchange your sweepstakes tokens for physical items via Prizeout, a third-party rewards platform.
>
> Our players love the flexibility of choosing cash prizes or fun rewards, making High 5 Casino a standout platform for social casino gamers.

74. Players must use real currency to purchase additional virtual Gold Coins and Sweeps Coins through the website. In this way, the purchase of virtual coins is like what happens when a player purchases casino chips in a brick-and-mortar casino, which can then be used to place wagers at table games.

75. The owners of a competitor gambling website, Chumba.com, publicly admitted in a securities filing that social casino gaming websites are modelled on the illegal Internet cafés that were popular in the early 2000's:

> 67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.
>
> 68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

76. High 5 Casino's illegal website is identical to Chumba.com in all material respects.

77. There are several other factors that show that the true purpose of the website is gambling, and that like the Internet cafés that preceded the launch of High5casino.com, the use of the term "sweepstakes" is a pretext for gambling.

78. First, the casino-like atmosphere and imagery associated with the website, as well as the use of the word "casino" in the website name, is evidence that the true purpose of the website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service.

79. Second, the duration of the "sweepstakes" promotion also demonstrates that the true purpose of the website is not to promote a bona fide consumer good or service, but instead gambling. A traditional sweepstakes promotion is a limited term event designed to attract consumer attention to a product or business, and ordinarily expires after a few weeks or months. In contrast, the purported "sweepstakes" on High5casino.com run perpetually.

80. Third, the typical payout percentage for a temporary promotional sweepstakes is a small percentage of revenue earned by the company. For example, the typical grand prize for McDonald's annual Monopoly-themed sweepstakes is usually about $1 million, which is a tiny fraction of the *billions* of dollars McDonald's earns each year. By contrast, casinos typically pay

out between 80-96 percent of their revenues (sometimes referred to as the "return to player" or "RTP"). High 5 claims to have a 92-96% "average RTP" on its website.

81. Fourth, conditions designed to keep customers playing longer are indicative that the true purpose of the website is to keep them gambling, rather than a true sweepstakes aimed at promoting a product or service. Unlike traditional sweepstakes games where prizes can be claimed immediately, High 5 imposes restrictions on prize redemption that can cause website visitors to play longer. Specifically, website visitors must have at least 50 Sweeps Coins to obtain gift cards and 100 Sweeps Coins to obtain cash. This forces consumers to continue gambling and eventually lose their balance.

82. Fifth, most if not all users of the website largely ignore their ample supply of Gold Coins in favor of playing Sweeps Coins, which is a clear indication that the Sweeps Coins, and not the supposedly promoted product (Gold Coins), are the primary subject of the transaction.

83. Sixth, High 5 doesn't promote a good or service, instead it is the good or service.

84. In sum, the parallels between High 5's website and the Internet sweepstakes café business model—which courts have held are incontestably gambling—are clear:

- ✓ Both sell a "product" that comes with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendant sells a virtual gold coin.
- ✓ Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald's Monopoly sweepstakes.
- ✓ Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.

- ✓ Both offer several ways to get free entries without requiring a product purchase, such as by mailing a postcard to a designated P.O. Box address, although the number of free entries awarded through this method is a very low amount, if anything at all.

**F. High Five Casino Promotes Gambling To Underage Minors**

85. The National Institute of Health reports that "despite its illegality among adolescents, online gambling is a common practice, which puts their mental health and well-being at serious risk." J. Behav. Addict., 2021 Sept. 16;10(3):566-586. Some research indicates a "greater addictive potential of online gambling over traditional gambling, especially for young problem gamblers." This general vulnerability is due to the developmental characteristics of adolescence, where individuals are more likely to engage in risky behaviors and develop addiction problems due to immature self-regulation capacity, impulsivity, external locus of control, and susceptibility to contextual factors. *See id.* "They may be lured by the pop-up gambling advertisements, offers of gifts and free play, tempting easy win messages, thrill of many online games, and visually exciting graphics and photos presented with the games." *Id.*

86. The lower the age of online gambling onset, the higher the probability of developing problematic online gambling and the more severe the psychosocial consequences are.

87. According to a 2024 University of Michigan national poll on children's health, nearly a third of U.S. parents say that they or another adult in their household have participated in gambling. Among those households, two-thirds reported that their teen has a bank account or credit card in their own name, and one in six admitted they would not know if their own child was betting online.

88. High 5 Casino is exploiting this phenomenon for profit.

89. In a January 17, 2025, post on High 5 Casino's website High 5 Casino posted an exuberant article on "How Gen Z is Revolutionizing Sweepstakes Casinos," describing how children as young as 15 years old respond to things like "instant gratification," "visual appeal," and "customization," next to a picture of a young teenager. As High 5 Casino went on to explain, "Sweepstakes casinos that cater to these preferences are more likely to capture and retain Gen Z's attention."

**[intentionally left blank]**

JANUARY 17, 2025 HIGH 5 CASINO

HIGH 5 CASINO

# How Gen Z is Revolutionizing Sweepstakes Casinos: Trends & Innovations

The gaming industry is constantly evolving, and the emergence of Gen Z players has introduced fresh perspectives and expectations that are reshaping the sweepstakes casino landscape.

Unlike previous generations, Gen Z grew up with technology at their fingertips, making their preferences a key driver of innovation in game design, rewards, and social features.

Let's explore how this tech-savvy generation is leaving its mark on sweepstakes casinos.

## THE DIGITAL-NATIVE MINDSET

Gen Z, born between the mid-1990s and early 2010s, is the first generation to grow up in a fully digital world.

They've never known life without smartphones, social media, and on-demand entertainment.

This upbringing has shaped their preferences in significant ways:

- **Instant Gratification**: Gen Z values quick and engaging experiences. Long loading times or overly complicated setups won't hold their attention.
- **Visual Appeal**: Sleek, vibrant, and modern graphics are non-negotiable. This generation appreciates polished aesthetics that reflect the standards of their favorite apps and games.
- **Customization**: Personalization is key. From avatars to gameplay settings, Gen Z expects options that let them express their individuality.

Sweepstakes casinos that cater to these preferences are more likely to capture and retain Gen Z's attention.

## GAME DESIGN TRENDS INSPIRED BY GEN Z

The influence of Gen Z is evident in the evolving design of sweepstakes casino games.

Traditional games are being reimagined to align with this generation's unique tastes and expectations.

**1. Interactive Gameplay**

Static gameplay doesn't appeal to a generation raised on interactive and immersive experiences.

Gen Z prefers games that feel dynamic, whether through bonus rounds, mini-games, or evolving storylines.

Games with layered mechanics, like cascading reels or split symbols, are particularly popular because they keep players engaged.

**2. Themed Experiences**

Themes matter more than ever.

Gen Z is drawn to games that tell a story or evoke a specific mood. Mythology, adventure, and pop culture-inspired free slots resonate because they feel relatable and exciting.

A slot isn't just a game—it's a mini escape into another world.

**3. Short Sessions, Big Impact**

This generation often favors shorter gaming sessions but expects maximum engagement during that time.



90. The article goes into further detail about how to best keep minors hooked with things like “daily bonuses” and “free spins.” “Instead of waiting for a single big win, Gen Z appreciates consistent, smaller rewards that keep gameplay exciting.”

91. Perhaps most disturbingly, the article goes on at length about how the look, feel, and features of High5casino.com are tailored to attract “younger audiences,” concluding with the statement, “the future is bright,” and that “the opportunities are endless for platforms willing to innovate and adapt” by tailoring their websites to that demographic.

**G. Defendant Misleads the Public with False Claims of Legality**

92. High 5 also engages in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce by misleading and causing confusion that participation in High 5 is legal in Mississippi.

93. In its terms and conditions, High 5 states its platform and games are not accessible and cannot be played by anyone in an “Restricted Territory.”

94. In its terms and conditions, High 5 lists the following Restricted Territories: “Arizona, California, Connecticut, Delaware, Idaho, Kentucky, Louisiana, Maryland, Michigan, Montana, Nevada, New Jersey, New York, Pennsylvania, Rhode Island, Tennessee, Washington and West Virginia.”

95. High 5 does not include Mississippi as a restricted territory, although online gambling in any form is strictly prohibited by the State of Mississippi.

96. Moreover, High 5 is accessible in Mississippi, which causes the users to believe that Mississippi permits such online gaming.

### H. All Purported Contracts With Defendant Never Existed

97. The entire contract, including the arbitration and delegation provisions specifically, lack consideration and mutual assent.

98. The only consideration paid by Plaintiffs and the Class members was wagers to gamble.

99. In Mississippi, "[c]ontracts, judgments, securities, conveyances made, given, granted, or executed, where the whole or any part of the consideration or foundation thereof shall be for money, or any valuable thing won, lost, or bet at any game or games, or on any horse-race, cock-fight, or at any other sport, amusement, or pastime, or on any wager whatever, or for the reimbursing or repaying any money knowingly lent or advanced for the purpose of such gaming or gambling, or to be wagered on any game, play, horse-race, cock-fight, or on any sport, amusement, pastime, or wager, shall be utterly void." Miss. Code Ann. § 87-1-1.

100. Thus, no contract was ever formed between the parties, and any purported contract between himself and Defendant, and any contractually based defenses Defendant may raise are likewise void.

101. And the *entire* contract is void, because even if the arbitration provision is severed from the rest of any contract, the arbitration provision itself is void as a matter of law pursuant to § 87-1-1.

102. Even if not void, they are unconscionable as the terms and conditions is an adhesion contract.

103. Plaintiff and Class members had no opportunity to negotiate the contract terms, and the terms never changed for any Class member.

104. Plaintiff and Class members had *zero* bargaining power.

105. Plaintiff and Class members could not have used High 5 unless they agreed to the terms and conditions, and they could not have obtained comparable products or services unless they agreed to arbitrate.

106. The terms and conditions are not easily accessible, and the arbitration clause, damages limitation, and other material provisions are not conspicuous. Instead, they are buried in a sea of font, in the same color and same type, not bold or in capital letters, and don't require an independent signature or acknowledgement.

107. The terms and conditions also unconscionably limit Plaintiffs' and Class members' damages, and do not afford them an opportunity to select or have a say in the arbitrator(s).

108. Moreover, the scope of the arbitration agreement, damages limitations, and other material provisions is too large, limiting all damages for every single claim against every single party, known or unknown.

109. The inclusion of a class action waiver is also unconscionable as the only practical effect is to chill or prevent claims, affording High 5 immunity.

110. Moreover, the expenses and forum are unfair and unconscionable, as the cost to pursue individual arbitration likely exceeds the reward, further chilling and preventing claims and affording High 5 immunity.

111. In sum, Plaintiffs and Class members paid to forgo everything – inability to protect their statutory and constitutional rights – and High 5 gains immunity at no cost. Plaintiffs and Class members were not given a *quid pro quo* for agreeing to arbitrate and forgoing their constitutional right to a trial by jury.

112. Moreover, Plaintiffs and Class members were fraudulently induced into entering these contracts. High 5 misrepresented that it was legal in Mississippi, on which Plaintiff and Class

members relied. Had High 5 disclosed the truth that it is not legal in Mississippi, Plaintiffs and Class members would not have entered into the contract with High 5.

113. Finally, the contract is illusory, since High 5 reserves the right to change the terms at any time without prior notice.

**I. Class Action Allegations**

114. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

115. Plaintiff seeks to represent the following Mississippi Class:

> All Mississippi residents who have paid and lost money or other things of value on High 5.

116. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

117. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

118. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

119. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant's alleged conduct violates applicable law;

c. Whether High 5 is illegal gambling in Mississippi;

d. Whether Plaintiffs and Class members wagered and lost money or other things value on High 5 in Mississippi;

e. The amount of money or other things of value wagered and lost by Plaintiff and Class members in Mississippi;

f. Whether Defendant engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Mississippi;

g. Whether Defendant's unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Mississippi were likely to deceive Class members;

h. whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

i. the amount and nature of relief to be awarded to Plaintiff and the other Class members.

120. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members wagered and lost money or other things of value on High 5 in Mississippi. Also, neither Plaintiff nor the other

Class Members would have participated on High 5's website had Defendant not engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

121. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

122. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

123. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense

to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

124. **Ascertainability** – High 5 maintains a robust database with all its participants. Each participant must create an account to participate and must select and verify which state they are from. High 5 also assigns each participant's account an individually identifiable number, and High 5 tracks winning and losses, because it controls how much a player can wager and cashout a day.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Declaratory Judgment**
**28 U.S.C. §§2201 *et seq*.**

125. Plaintiff incorporates by reference the allegations contained in paragraphs 1-124 of this complaint.

126. Plaintiff brings this count individually and on behalf of all other Class members.

127. Mississippi law heavily regulates all forms of gambling.

128. In Mississippi, gambling means "the wagering or betting of any money or other valuable things, upon any game, play, amusement." Miss. Code Ann. § 97-33-1.

129. In Mississippi, a game is chance-based, not skill-based, when more chance is involved in the outcome than skill. High 5 operates an illegal gambling website (High5casino.com) wherein participants pay consideration for the chance to win a prize.

130. The Chance Games offered by High 5 are predominantly games of chance and do not involve any level of skill.

131. The prizes High 5 offers are valuable and can be used as or converted into US currency.

132. High 5 operates an online casino, not a sweepstakes. In Mississippi, even though the player is assured of his money's worth of some commodity and hence cannot lose, it is still illegal gambling. In fact, even paying back up to 98% of all money played is illegal gambling (where the typical sweepstakes payout is 50%). And the duration of traditional sweepstakes is limited, not indefinite, like Stake.us. And just because Plaintiff and Class members can play for free does not save High 5, the Mississippi Supreme Court has long held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme: "The award of credits … to play free additional games is likewise something of value, as a credit to play a free game necessarily has the same value as the amount it would cost to play that game." *Mississippi Gaming Comm'n v. Henson*, 800 So. 2d 110, 115 (Miss. 2001). Moreover, High 5 does not promote or market a good or service, it is the good or service. And High 5 does not offer any free-play tokens available at any location in Mississippi.

133. Plaintiff and Class members each paid money or other things of value to High 5 to play the Chance Games for the sole purpose of winning a prize.

134. Plaintiffs and Class members seek an order declaring that (1) High 5 is illegal gambling in Mississippi and (2) any authority under which it purports to operate is illegal, as well as a permanent injunction enjoining High 5 from operating in Mississippi, with disgorgement of profits.

135. Plaintiffs and Class members also seek a speedy declaratory judgment hearing pursuant to Fed. R. Civ P. 57.

**<u>SECOND CAUSE OF ACTION</u>**
**MISSISSIPPI GAMBLING LOSS RECOVERY STATUTE**
**Miss. Code Ann. § 87-1-5, *et seq.***

136. Plaintiff incorporates by reference the allegations contained paragraphs 1-135 of this Complaint.

137. Plaintiff brings this count individually and on behalf of all other Class members.

138. Plaintiff is similarly situated as other Class members, as each are Mississippi residents who have either paid and lost money or other things of value on Stake.us in the last six years, or are the spouse, child, or next of kin of a Mississippi resident who paid and lost money or other things of value on High5casino.com in the last six years.

139. High 5 operates an illegal gambling website that is accessible in Mississippi.

140. In the last six years, Plaintiff and other Class members paid and lost money or other things of value to High 5 on High5casino.com.

141. Plaintiff and other Class members demand recovery of the money or other things of value paid and lost to High 5 on High5casino.com in the last six years in an amount to be determined at trial, including interest.

142. Plaintiffs also seek recovery of money or other things paid and lost on High5casino.com in the last six years on behalf of the spouses, children, and next of kin of the losers.

143. Plaintiff and Class members also seek an order declaring that (1) High5casino.com is illegal gambling in Mississippi and (2) any authority under which it purports to operate is illegal, as well as a permanent injunction enjoining High 5 from operating High5casino.com in Mississippi, with disgorgement of profits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in him favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representatives, and appointing Plaintiff's attorneys as Class Counsel;

B. Declaring that High 5 is illegal gambling in Mississippi and that any authority under which it purports to operate is not legal;

C. Enter a permanent injunction permanently enjoining Defendant from operating High 5 in Mississippi;

D. Ordering Defendant to refund all wages lost, including double, by the Class and pay actual and statutory damages (including punitive damages) and restitution and disgorgement of profits to Plaintiff and the Class, as allowable by law;

E. Ordering Defendant to pay both pre- and post-judgment interest on any amount awarded;

F. Ordering Defendant to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as the Court may deem just, equitable, and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 27, 2026

/s/ *Ronnie Musgrove*
Ronnie Musgrove

Ronnie Musgrove (MS Bar #3698)
David S. Humphreys (MS Bar #100085)
MUSGROVE, WHITWELL &
HUMPHREYS, PLLC
265 N. Lamar Blvd., Suite C
Oxford, MS 38655
Telephone: (662) 273-8424
musgrove@mwhlawoffice.com
david@mwhlawoffice.com

*Attorneys for Plaintiff*